ATTORNEY FOR PETITIONERS:
**JAMES P. FENTON**
ATTORNEY AT LAW
Fort Wayne, IN

ATTORNEYS FOR RESPONDENTS:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**J. DEREK ATWOOD**
**TRENT D. BENNETT**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

**MARK J. CRANDLEY**
BARNES & THORNBURG LLP
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| ALICE LUEBKE, TINA HUGHES, AMANDA SCHEITLIN, and ANN CORNEWELL, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Cause No. 24T-TA-00007 |
| | ) |
| INDIANA DEPARTMENT OF LOCAL GOVERNMENT FINANCE, ALLEN COUNTY, INDIANA (an Indiana municipality), ALLEN COUNTY BOARD OF COMMISSIONERS, being F. NELSON PETERS, THERESE M. BROWN, and RICHARD BECK, in their official capacities only, and the ALLEN COUNTY, INDIANA BUILDING CORPORATION, | ) |
| | ) |
| Respondents. | ) |

FILED
Sep 13 2024, 3:24 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION OF
THE DEPARTMENT OF LOCAL GOVERNMENT FINANCE

**FOR PUBLICATION**
**September 13, 2024**

WELCH, Special J.

A coalition of Allen County taxpayers is objecting to the Allen County Board of Commissioners' plan to build a new jail, challenging the legality of a lease approved by the Department of Local Government Finance (the "DLGF").[1] These taxpayers contend that the lease is unlawful because the statutory framework for county leases does not permit the sale-leaseback of historical buildings long owned by the county, such as the venerable Allen County Courthouse. They further argue that the jail's construction cannot proceed because a resolution lacks the statutorily required determination of need for the Courthouse sale-leaseback. The Commissioners, however, assert that their plan to build the new jail must move forward, arguing that the taxpayers lack standing to challenge it and that the lease and resolution comply with the law. Finding no merit in the Commissioners' standing claim or the taxpayers' challenge to the lease and the resolution, the Court holds the lease is legally valid for purposes of the disputed statutory framework and affirms the final determination of the DLGF.

## FACTS AND PROCEDURAL HISTORY

The Allen County Jail, which started operations in 1981, has undergone several renovations and currently has 732 permanent beds. (*See* Cert. Admin. R. at 446.) In recent years, its occupancy has ranged from 700 to 900 inmates, regularly exceeding its maximum occupancy of just 586 beds.[2] (*See* Cert. Admin. R. at 390, 448.) The overcrowding issue, along with concerns about understaffing and safety threats, led to

---

[1] For purposes of this opinion, Allen County and the Allen County Board of Commissioners are used interchangeably, as the Commissioners are the executive body of the Allen County government. *See* IND. CODE § 36-2-3.5-3 (2024).

[2] "A jail is overcrowded long before every bed is filled. This is because there must be enough beds in the proper cell locations so that prisoners can be adequately classified and separated." *Morris v. Sheriff of Allen Cnty.*, No. 1:20-CV-34 DRL, 2022 WL 971098 at *9 (N.D. Ind. Mar. 31, 2022).

legal action, resulting in the United States District Court for the Northern District of Indiana holding in 2022 that the conditions at the Jail violated inmates' constitutional rights. *See Morris v. Sheriff of Allen Cnty.*, No. 1:20-CV-34 DRL, 2022 WL 971098, at *1 (N.D. Ind. Mar. 31, 2022). The court mandated corrective measures and ordered the Commissioners to propose a long-term solution. *Id.* at *16-17.

In response to the court's ruling, the Commissioners engaged Elevatus, a local architectural firm, to evaluate options for addressing the Jail's issues. (*See* Cert. Admin. R. at 388.) Elevatus's report analyzed several solutions, including expanding the current Jail, establishing a regional facility, outsourcing inmates to nearby county jails, and constructing a new jail at a different location. (*See* Cert. Admin. R. at 384-421.) The Commissioners ultimately determined that building a new jail was the best course of action. (*See, e.g.*, Cert. Admin. R. at 204-73.)

The new jail was projected to take at least three years to build, with an estimated cost of roughly $320 million. (*See* Cert. Admin. R. at 379, 408.) The Commissioners undertook several steps to move this project forward. For instance, they established the "Allen County, Indiana Building Corporation" to assist the County in financing its facilities by acquiring, owning, constructing, renovating, and leasing both existing and new county buildings. (*See* Cert. Admin. R. at 284-96.) In addition, they planned to convey the historic Courthouse to this newly formed entity, which would then lease the property back to the County during the new jail's construction. (*See* Cert. Admin. R. at 284-89.) The sale-leaseback plan for the Courthouse sought to reduce overall costs by avoiding approximately $28 million in capitalized interest expenses during the initial construction period, thereby lowering the lease payments for the new jail. (*See* Cert.

3

Admin. R. at 195-96, 506-07 ¶ 67, 516 ¶ 104.) The Building Corporation and the Commissioners executed a lease-purchase agreement ("the Lease") to implement the sale-leaseback plan and formalize the terms for leasing the new jail. (*See* Cert. Admin. R. at 21-44.) Furthermore, the Commissioners reviewed two reports that analyzed additional financing options for the new jail, primarily through either an adjusted gross income tax (the "Jail LIT") or an *ad valorem* property tax. (*See* Cert. Admin. R. 24-25, 368-83, 512-13 ¶¶ 91-94.)

Opposition to the new jail project soon emerged from the Allen County Residents Against the Jail and others, proposing a vertical expansion of the existing Jail instead of building a new facility. (*See, e.g.*, Cert. Admin. R. at 470-73.) Over ninety Allen County taxpayers filed a petition with the County Auditor, raising multiple objections to the Lease. (*See* Cert. Admin. R. at 1-20, 218.) The Auditor certified the petition to the DLGF on December 15, 2023, and a public hearing was held on January 4, 2024. (*See* Cert. Admin. R. at 490 ¶¶ 16-18, 520-664.) On February 22, 2024, the DLGF issued a final determination rejecting all the taxpayers' objections and denying their petition. (Cert. Admin. R. at 488-519.)

On March 21, 2024, Alice Luebke, Tina Hughes, Amanda Scheitlin, and Ann Cornewell (the "Objectors") initiated this original tax appeal, seeking to terminate the Lease and halt the construction of the new jail. (*See* Pet'rs' V. Pet. Jud. Rev. Final Determination of the Dep't Loc. Gov. Fin. Dated Feb. 22, 2024 ("Pet'rs' Pet."), ¶¶ 18-38.) The Commissioners then moved to compel the Objectors to post a bond, arguing that delays in the new jail project due to this lawsuit could add over $91 million in costs for Allen County taxpayers. (*See* Resp'ts' Br. Supp. Mot. Require Pl. Post Bond

4

Pursuant to Ind. Pub. Lawsuit Statute at 1-2.) The Objectors filed a brief in response to the Commissioners' motion for bond on May 8, 2024, followed by the Commissioners' reply brief on May 15, 2024. The Objectors then submitted additional documents regarding the motion on June 10, 2024. After an evidentiary hearing and oral argument on June 12, 2024, the Court denied the Commissioners' motion for bond on July 5, 2024. *See Luebke v. Indiana Dep't of Loc. Gov't Fin.*, Case No. 24T-TA-00007, 2024 WL 3310423 (Ind. Tax Ct. July 5, 2024).

On June 28, 2024, the Objectors submitted a brief on the merits. The Commissioners and the DLGF filed separate response briefs on July 12, 2024, with the Objectors reply following on July 26, 2024. On August 9, 2024, the Court held an oral argument on the merits in Allen County. During the argument, the Objectors requested that the Court take judicial notice of the DLGF's final determination, the bond hearing transcript, and the related briefs. (*See* Oral Arg. Tr. at 9-10.) The Court granted this request. (*See* Oral Arg. Tr. at 15.)

In addition, the Objectors moved for the Court to admit or take judicial notice of the four exhibits previously admitted during the bond hearing. (Oral Arg. Tr. at 9-10.) These exhibits were (1) a lease dated December 1, 2023, between the Building Corporation and the Commissioners; (2) a letter dated January 18, 2024, written by Mark J. Crandley; (3) a letter dated September 23, 2023, written by the Honorable Frances C. Gull; and (4) a copy of the disputed resolution. (Notice, June 13, 2024.) The Commissioners promptly objected to the Court taking judicial notice of Judge Gull's letter, arguing that it was not part of the certified administrative record. (*See* Oral Arg. Tr. at 10-13.)

5

The Court sustained their objection, clarifying that, unlike the bond proceedings, it is now limited to considering only the evidence within the certified administrative record when reviewing the DLGF's final determination. (*See* Oral Arg. Tr. at 13-15.) *See also, e.g.*, *Bd. of Comm'rs of Clark Cnty. v. Indiana Dep't of Loc. Gov't Fin.*, 31 N.E.3d 552, 555 n.3 (Ind. Tax Ct. 2015); *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1326-29 (Ind. Ct. App. 1981) (discussing the limited nature of the scope of judicial review of administrative agency decisions in general). While three of the four exhibits were part of the record, Judge Gull's letter was not. Consequently, the Court cannot consider Judge Gull's letter or any portion of it presented in the parties' briefs.[3]

## STANDARD OF REVIEW

The party seeking to overturn a final determination of the DLGF bears the burden of demonstrating its invalidity. *See Indianapolis Pub. Transp. Corp. v. Indiana Dep't of Loc. Gov't Fin.*, 988 N.E.2d 1274, 1277 (Ind. Tax Ct. 2013). Accordingly, the Objectors must demonstrate to the Court that the DLGF's final determination is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or in excess of statutory authority. *See id.*

## DISCUSSION

The Objectors' challenge to the legality of the Lease centers on two alternative arguments based on Indiana Code section 36-1-10-7(c) ("Section 7"), which they contend should halt the new jail's construction. First, the Objectors claim that Section 7

---

[3] The Objectors made an offer of proof regarding Judge Gull's letter. They argued that the letter was critical to determining whether the construction of a new jail is necessary. (*See* Oral Arg. Tr. at 15-16.)

6

does not permit the sale-leaseback of the Courthouse. (*See* Pet'rs' Br. Supp. [Pet'rs' Pet.] ("Pet'rs' Br.") at 2-6.) Alternatively, they argue that the County Council failed to determine in Resolution No. 2023-11-16-01 (the "Resolution") that the sale-leaseback of the Courthouse is "needed," as required by Section 7. (*See* Pet'rs' Br. at 3-5.) The Commissioners and the DLGF respond that both the Lease and the Resolution comply with Section 7. (*See* Comm'rs' Br. Opp'n Pet. Jud. Rev. ("Comm'rs' Br.") at 8-17; Dep't Loc. Gov't Fin. Br. at 10, 14-15.) Additionally, the Commissioners argue that the Objectors lack standing to bring this challenge. (*See* Comm'rs' Br. at 18-20.)

Given these competing claims, the Court must first determine whether it has the authority to consider the merits of the case. "To seek judicial review of a dispute, a litigant must have standing – that is, it must be a proper party to invoke the court's authority." *Solarize Indiana, Inc. v. S. Indiana Gas & Elec. Co.*, 182 N.E.3d 212, 215 (Ind. 2022). "Standing is a threshold issue: if it is lacking, the court cannot consider the merits of the claim." *Id.* Accordingly, the Court will first address the Commissioners' argument on standing before proceeding to the substantive arguments raised by the Objectors concerning Section 7.

**The Objectors' Right to Challenge the Lease Affirmed**

The Commissioners argue that this case is not properly before the Court because the Objectors lack standing "to challenge the lease of the Courthouse[.]" (*See* Comm'rs Br. at 19.) They contend that the Objectors have not established an injury sufficient to confer standing because they have focused solely on the use of the Courthouse as a financing method for the new jail. (*See* Comm'rs Br. at 19-20.)

"Standing requires litigants to demonstrate a sufficient injury before a court can

7

decide the substantive issues of their claims." *Holcomb v. Bray*, 187 N.E.3d 1268, 1286 (Ind. 2022) (citation omitted). This determination is made by examining the allegations in the lawsuit, not by considering its outcome. *Id.* "An injury must be personal, direct, and one the [petitioners] ha[ve] suffered or [are] in imminent danger of suffering." *Id.* (citation omitted). While a statute can confer standing, it does so only if it requires an injury. *City of Gary v. Nicholson*, 190 N.E.3d 349, 351 (Ind. 2022) (citing *Solarize*, 182 N.E.3d at 215, 218 n.4).

The Commissioners suggest that the Objectors have not been injured by the sale-leaseback of the Courthouse, when viewed as a separate, unrelated transaction from the jail project. However, they have provided no reason to consider these transactions in isolation. On the contrary, the Commissioners have consistently emphasized that the sale-leaseback of the Courthouse is integral to the new jail project. Indeed, the sale-leaseback is designed to generate revenue that will reduce lease payments by avoiding millions in capitalized interest during the new jail's construction. (*See* Cert. Admin. R. at 195-96.) This demonstrates that the construction of the new jail and the sale-leaseback of the Courthouse are inherently interrelated, with the financing and execution of one directly impacting and supporting the other.

An examination of the relationship between the sale-leaseback of the Courthouse and the new jail project confirms the Objectors' standing in this case. The sale-leaseback of the Courthouse is a means of funding the new jail project that directly impacts each of the Objectors individually as taxpayers and property owners. The Commissioners and the Building Corporation executed a single lease encompassing both the Courthouse and the new jail, creating a unified funding structure. The sale-

leaseback is not merely an isolated transaction, but plays a critical role in generating substantial revenue to reduce the overall financial burden on other funding sources. The funds required to cover lease payments are sourced from the Jail LIT, economic development revenues from a local income tax and, if necessary, the County's property tax. (*See* Cert. Admin. R. at 24-25.) Without this revenue stream, any shortfall would likely be offset by increasing reliance on the Jail LIT, economic development funds, or property taxes, directly affecting the taxpayer Objectors. Thus, the sale-leaseback and new jail project are not just parallel transactions, but form an interdependent funding framework that materially impacts the taxpayers and property owners of Allen County.

The Commissioners' own arguments demonstrate that the sale-leaseback of the Courthouse is designed solely to fund the new jail project. Similarly, the Objectors challenge to the legality of the sale-leaseback, inherently involves the entire financing structure, which directly relies on taxpayer contributions, including the Jail LIT and potentially the County's property tax. As taxpayers and property owners, the Objectors are directly impacted by the commitment of their tax liabilities in support of this funding arrangement. Thus, their challenge is not just to the isolated transaction of the sale-leaseback of the Courthouse, but to a funding scheme that imposes a personal and imminent financial burden. Consequently, the Court finds that this impact constitutes a personal and direct injury, satisfying the requirement for standing.

**The Courthouse Sale-Leaseback and the Resolution Comply with Section 7**

The Objectors challenge the lawfulness of the Commissioners' plan to construct the new jail pursuant to Section 7 on two grounds. First, they argue that Section 7 does not explicitly authorize the sale-leaseback of the Courthouse. (*See* Pet'rs' Br. at 2-5.)

9

Second, they assert that the Resolution violates Section 7 because the County Council failed to determine that the sale-leaseback of the Courthouse is "needed." (*See* Pet'rs' Br. at 3-5.)

### Section 7 Authorizes the Courthouse Sale-leaseback Transaction

The Objectors claim that the term "structure" under Section 7 does not encompass a "project" like the sale-leaseback transaction at issue here. (*See* Pet'rs' Br. at 3-5.) In support of their argument, they reference a seminal treatise on textualism and a dictionary definition, contending that "structure" must be interpreted in its ordinary sense to mean "'something (such as a building) that is constructed.'" (*See* Pet'rs' Br. at 3-4 n.2 (citation omitted).) This interpretation, however, contradicts several principles of statutory construction.

"The first step in statutory interpretation is to determine 'whether the legislature has spoken clearly and unambiguously on the point in question.'" *Study v. State*, 24 N.E.3d 947, 951-52 (Ind. 2015) (citation omitted). Clear and unambiguous statutes are not subject to judicial construction; instead, courts must interpret the statute's words according to their plain and ordinary meanings. *Id.* Moreover, the words in a specific section of a statute must be read within the context of the entire statutory act. *See Kokomo Urb. Dev., LLC v. Heady*, 125 N.E.3d 15, 19 (Ind. Tax Ct. 2019); *Minser v. DeKalb Cnty. Plan Comm'n*, 170 N.E.3d 1093, 1100 (Ind. Ct. App. 2021). The Court may not expand or contract the meaning of an unambiguous statute by reading into it language to correct supposed omissions or defects or substituting language that it feels the Legislature may have intended. *Hutcherson v. Ward*, 2 N.E.3d 138, 142 (Ind. Tax Ct. 2013). Thus, the Court begins its analysis with the text of the statute itself, which is

10

clear and unambiguous.

At the time the Lease was executed, Section 7 provided as follows:

> (a) As used in this section, "threshold amount" means two hundred fifty thousand dollars ($250,000).
>
> (b) This section does not apply if the total annual cost of the lease is less than the threshold amount.
>
> (c) A leasing agent for a political subdivision, other than a school corporation, may not lease a structure, transportation project, or system unless:
>
>> (1) the leasing agent receives a petition signed by fifty (50) or more taxpayers of the political subdivision or agency; and
>>
>> (2) the fiscal body of the political subdivision determines, after investigation, that the structure, transportation project, or system is needed.

IND. CODE § 36-1-10-7 (2023). For purposes of Section 7, the term "structure" is statutorily defined as either "(1) a building used in connection with the operation of a political subdivision; or (2) a parking facility." IND. CODE § 36-1-10-2 (2023). A "leasing agent" is defined as "the board or officer of a political subdivision or agency with the power to lease structures." I.C. § 36-1-10-2.

Given the facts of this case, Section 7 unambiguously specifies that a political subdivision (excluding school corporations) cannot lease a structure (e.g., "a building used in connection with the operation of a political subdivision") if the total annual cost exceeds $250,000 unless two conditions are met: (1) the leasing agent receives a petition signed by 50 taxpayers from the political subdivision, and (2) the fiscal body of the political subdivision determines, after investigation, that the lease is needed. I.C. § 36-1-10-7. Here, the estimated annual lease rental of $22.2 million for a 20-year term exceeds the $250,000 threshold, requiring that the two conditions under Section 7 be

11

met. (*See* Cert. Admin. R. at 23-24, 518-19 ¶ 118.)

On the most fundamental level, a sale-leaseback transaction comprises two separate yet related components: the sale of the Courthouse and its subsequent lease. *See, e.g.*, BLACK'S LAW DICTIONARY 1068 (11th ed. 2019) (defining a "leaseback" as "[t]he sale of property on the understanding, or with the express option, that the seller may lease the property from the buyer, usu[ally] immediately after the sale"). The Courthouse is unmistakably a "structure" under Section 7 as it is "a building used in connection with the operation of a political subdivision[.]" I.C. 36-1-10-2. Thus, the Objectors' focus on whether the sale-leaseback transaction is consistent with the dictionary definition of "structure" overlooks the statutory definitions and requirements for leasing the Courthouse and is misplaced. *See Minser*, 170 N.E.3d at 1100 ("'A legislative purpose, shown by the context of a statute, should not be defeated by mere blind adherence to definitions of words found in dictionaries, however reputable.'") (citation omitted).

Under Indiana's Home Rule Act, a governmental unit like the Commissioners, has the authority to "'exercise any power it has to the extent that the power: (1) is not expressly denied by the Indiana Constitution or by statute; and (2) is not expressly granted to another entity.'" *See Anderson v. Gaudin*, 42 N.E.3d 82, 86 (Ind. 2015) (citations omitted). "Any doubt as to the existence of a unit's power must be resolved in favor of its existence." *Id.* (citation omitted). In the absence of statutory prohibition, it is reasonable to presume that the Commissioners have the authority to transfer the Courthouse – a property that the Objectors concede the County has owned in fee simple for over 120 years – to the Building Corporation. Moreover, the right to convey

12

property is a fundamental aspect of the "bundle of rights" inherent in property ownership. *See* BLACK'S LAW DICTIONARY 1332 (defining "ownership" as "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others"). Indiana's Home Rule Act grants the Commissioners broad discretion to manage and leverage county assets, including engaging in financial transactions like sale-leasebacks that are neither expressly prohibited nor limited by statute.

From a functional perspective, the sale-leaseback's predominate purpose is not the sale of the Courthouse but is its lease back to the County, which is governed by Section 7. Sale-leaseback transactions are structured to facilitate leasing, providing immediate use of the asset while leveraging it for financial purposes. *See, e.g.*, 2 Richard R. Powell, POWELL ON REAL PROPERTY Ch. 17A (Michael A. Wolf ed., 2024) (characterizing the sale-leaseback as an example of a modern lease); 2 Richard R. Powell, POWELL ON REAL PROPERTY § 17.04 (Michael A. Wolf ed., 2024) (examining the financial and tax implications of the lease component in sale-leaseback transactions); APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 466 (14th ed. 2013) (describing sale-leasebacks as "financing vehicles"). Here, the sale is an integral but auxiliary step designed solely to enable the lease, bringing the sale-leaseback of the Courthouse within the statutory framework governing the leasing of structures by counties.

The Objectors nonetheless argue that this transaction could not have been authorized under Section 7 because the statute does not apply to sale-leasebacks. (*See* Pet'rs' Br. at 5-6.) They maintain that Indiana Code section 36-1-10-16 is the only statute within the statutory framework for county leases that authorizes sale-leasebacks, and it limits these transactions solely to refinancing situations. (*See* Pet'rs' Br. at 5-6.)

13

Indiana Code section 36-1-10-16 provides that "[a] political subdivision or agency owning a structure with respect to which its revenue bonds are outstanding may, to refinance those bonds, convey the structure to the lessor in fee simple and lease it from the lessor[.]" IND. CODE § 36-1-10-16(a) (2024). As just mentioned, Allen County has owned the Courthouse in fee simple for over a century. The Objectors' arguments regarding Indiana Code section 36-1-10-16 therefore fail to gain traction because the statute addresses circumstances not relevant to this case, and nothing within the terms of Section 7 suggests it does not apply to sale-leaseback transactions. *See ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) (providing that courts must be "mindful of both what [a statute] does say and what it does not say") (citation and internal quotation marks omitted). Indeed, Section 7 explicitly addresses leases of governmental structures and does not restrict the financing methods used; thus, it encompasses, rather than excludes, the sale-leaseback model employed here.

The Objectors emphasize that the Commissioners claimed, but did not provide evidence, that sale-leasebacks like the one in this case are routine financing methods used by municipalities. (See Pet'rs' Reply Br. Supp. [Pet'rs Pet.] ("Pet'rs' Reply Br.") at 2-4.) However, the absence of evidence proving the widespread nature of this practice does not alter the statutory authority that permits engaging in such transactions. By its plain language, Section 7 authorizes the Commissioners to lease the Courthouse after its sale, provided the statutory conditions are met. The certified administrative record establishes that the first condition was satisfied: 91 Allen County property owners – well exceeding the 50-taxpayer threshold – signed a petition supporting the Commissioners' lease negotiations with the Building Corporation. (*See* Cert. Admin. R. at 218-73.) As for

14

the second condition, the Objectors have not contested the adequacy of the fiscal body's investigation into the need for the lease of the Courthouse on appeal. (*See* Pet'rs' Br. at 2-11; Pet'rs' Reply Br. at 2-11.) Thus, the sole remaining issue on the Lease's legality is whether the County Council determined in the Resolution that leasing the Courthouse is needed. If this determination was made, the Lease stands as legally valid under Section 7.

### *The County Council Determined the Courthouse Sale-leaseback is "Needed"*

The Objectors' next argument is twofold. First, they contend that the County Council failed to expressly determine in the Resolution that the leaseback of the Courthouse was "needed," as required by Section 7. (*See* Pet'rs' Br. at 4-5.) Second, they maintain that no implicit determination of need can be inferred because "[t]he ordinary meaning of the term 'project, as used in the [County] Council's Resolution[,] does not mean 'structure.'" (Pet'rs' Br. at 4-5.) These arguments, like their other claims, misinterpret the principles of statutory construction by narrowly focusing on isolated terms without considering the full context of the Resolution.

The interpretation of a county resolution is subject to the same rules that governed the construction of Section 7, requiring the text to be read in its entirety and understood within the broader context. *See Hochstedler v. St. Joseph Cnty. Solid Waste Mgmt. Dist.*, 770 N.E.2d 910, 914 (Ind. Ct. App. 2002), *trans. denied*; *Payne v. Town of Austin*, 523 N.E.2d 245, 248 (Ind. Ct. App. 1988), *trans. denied*. With these principles in mind, the pertinent portions of the Resolution provide as follows:

> WHEREAS, to provide for [the] acquisition of certain real estate in the County, including the existing Allen County Courthouse located at 715 Calhoun St, Fort Wayne, Indiana (the "Existing Real Estate"), and the real estate located at 3003 Meyer

Road, Fort Wayne, Indiana (the "New Facility Real Estate"), and the financing of the acquisition, construction, improvement, and/or equipping of all or any portion of a new county jail facility to be located at the New Facility Real Estate, together with any related improvements, all to be used for the purposes of providing incarceration, community corrections, or other law enforcement or criminal justice services by Allen County, Indiana (the "Project"), the [Commissioners] will consider a resolution approving the terms and conditions of a lease between a building corporation (the "Building Corporation"), as lessor, and Allen County, Indiana (the "County"), as lessee (the "Lease"), for all or a portion of the Existing Real Estate, the New Facility Real Estate, and the Project, including any appurtenances or improvements thereto[.]

* * * * *

NOW, THEREFORE, BE IT RESOLVED BY THE COUNTY COUNCIL OF ALLEN COUNTY, INDIANA, AS FOLLOWS:

Section 1.  Findings: Approval of Lease. After investigation, the [County] Council hereby finds and determines that a need exists for the Project and that the Project to be financed through the Lease will be of public utility and benefit to the County. The [County] Council further determines that the Project cannot be acquired, constructed, improved, and equipped from any funds available to the County. The County shall proceed to take such steps as may be necessary to secure the acquisition, construction, equipping, and leasing of the Project as provided by Ind. Code 36-1-10.

(Cert. Admin. R. at 275-76.)

The Resolution's text demonstrates that the determination of need for the leaseback of the Courthouse was made as part of the broader Project. The Courthouse, identified as the "Existing Real Estate," is explicitly included within the scope of the property to be acquired, improved, and leased under the Project. In Section 1, the County Council expressly finds and determines that there is a need for the Project, which necessarily includes the leaseback of the Courthouse given its inclusion as part of the defined Project.

The Resolution further clarifies that the County Council's approval of the Lease

16

encompasses all property within the Project, including the Courthouse. This explicit connection supports the conclusion that the leaseback of the Courthouse was determined to be needed as an integral part of the Project. The County Council's approval and findings satisfy the statutory requirement of need under Section 7, a conclusion also reached by the DLGF.

The certified administrative record establishes that the statutory conditions were met regarding the Courthouse sale-leaseback, and the Resolution's language is sufficient to conclude that the County Council determined the leaseback of the Courthouse was "needed," both expressly and implicitly. Therefore, the Court holds that the Lease is legally valid under Section 7.

Finally, during oral argument, the Objectors introduced an entirely new complaint against the construction of the new jail, asserting that the Lease does not comply with Indiana Code section 36-1-10-17 because the County imposed an income tax instead of a property tax to fund the project. (*See* Oral Arg. Tr. at 20-24.) However, this issue was not raised during the administrative proceedings, as the certified administrative record contains no evidence of it being discussed. (*See* Cert. Admin. R. at 488-664.) Procedurally, issues must be raised at the administrative level to be considered on appeal; thus, the Objectors have waived this issue. *See, e.g.*, *Inland Steel Co. v. State Bd. of Tax Comm'rs*, 739 N.E.2d 201, 220 (Ind. Tax Ct. 2000), *review denied*.

Even if waiver did not apply, the Objectors' argument lacks merit. The statute cited by the Objectors permits the use of property taxes to pay lease rentals but does not require property taxes to be the exclusive funding source or prohibit funding lease payments through other means, such as income taxes. *See* IND. CODE § 36-1-10-17(a)

17

(2024) ("A political subdivision or agency that executes a lease under this chapter shall . . . make an annual appropriation and tax levy at a rate to provide sufficient money to pay the rental payable from property taxes stipulated in the lease.").

## CONCLUSION

For all these reasons, the final determination of the DLGF that upheld the sale-leaseback of the Courthouse as one of the financing methods for the new jail is AFFIRMED.